Steve W. Berman (*Pro Hac Vice*)
Jerrod C. Patterson (*Pro Hac Vice*)
Anthea Grivas (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite #3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com
antheag@hbsslaw.com

Robert C. Hilliard (*Pro Hac Vice*)
Marion Reilly (*Pro Hac Vice*)
HILLIARD MUÑOZ GONZALES LLP
719 S. Shoreline Blvd., Suite #500
Corpus Christi, TX 78401
Telephone:  (361) 882-1612
Facsimile:  (361) 882-3015
bobh@hmglawfirm.com
marion@hmglawfirm.com

*Counsel for Plaintiffs Gail Payne
and Stephanie Smith*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GAIL PAYNE and STEPHANIE SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL (d/b/a MAJOR LEAGUE BASEBALL), ROBERT D. MANFRED, JR., THE LOS ANGELES DODGERS, THE SAN DIEGO PADRES, THE SAN FRANCISCO GIANTS, THE LOS ANGELES ANGELS OF ANAHEIM, AND THE OAKLAND ATHLETICS,<br><br>Defendants. | No. 4:15-CV-03229-YGR<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEFING ON STANDING**<br><br>**[REDACTED VERSION]** |

010525-11 888342 V1

## I. INTRODUCTION

Pursuant to this Court's Order, the parties have completed discovery in this case on whether Plaintiffs have standing. The evidence demonstrates unequivocally that Plaintiffs have been adversely affected by the lack of sufficient safety netting at the ball parks. As described below, both the fear of being struck by a ball, and the deprivation of their ability to fully enjoy the games, is sufficient to establish standing.

## II. FACTUAL BACKGROUND

### A. Plaintiffs' Testimony Establishes That They Have Standing

#### 1. Gail Payne

Plaintiff Gail Payne testified in her deposition that she regularly attends baseball games at the Oakland Athletics' Coliseum, but her enjoyment of games is limited because of the lack of sufficient safety nettings. Ms. Payne was born and raised in Oakland, and has been an A's fan since attending her first game in 1968.[1] She has attended well over 100 games during her lifetime. *Id.* at 19:9-21. She purchased a 24-game pack of tickets for both the 2015 and 2016 seasons. *Id.* at 24:5-10; 32:2-5. She attended at least seven games as of the deposition, and attended six games after the deposition.[2] She has primarily sat in Sections 211 and 215 of the Coliseum; these are her preferred seats because of the view she has of the game. *Id.* at 42:5-11. She primarily sits in Section 211, and occasionally sits in Section 215 or other locations.[3] Seats that are protected by the netting are more expensive, and she could not trade her other seats for protected seats. *Id.* at 40:8-18. Although these are her preferred seats, she fears for her safety when she sits in those sections. *Id.* at 41:24-42:4. If netting was extended, she testified that "I would enjoy [the game] a lot because I spend my time ducking and dodging balls that come into Section 211 at every game. I've seen people sitting around me that do

---

[1] *See* Declaration of Jerrod C. Patterson in Support of Plaintiffs' Supplemental Briefing on Standing ("Patterson Decl."), Ex. A (deposition of Gail Payne) ("Payne Dep.") at 18:4-11.

[2] *Id.* at 33:19-34:1; Patterson Decl., Ex. B (Declaration of Gail Payne) ("Payne Decl.") ¶ 1. Ms. Payne testified that she was unsure of her plans to attend future games because of her husband's health concerns. But the subsequent record demonstrates that she has continued to attend games, and plans to attend games in 2017. *See* Payne Decl. ¶¶ 1-2; Payne Dep. at 37:20-22.

[3] In particular, in 2015 she sat in Section 211 fifteen times; Section 215 four times; and other sections four times. *See* Patterson Decl., Ex. C (Payne Dep. Ex. 12). In 2016, she sat in Section 211 nineteen times, and Section 5 five times. *See id.*, Ex. D (Payne Dep. Ex. 13).

PLAINTIFFS' SUPP. BRIEFING ON STANDING - 1
Case No.: 4:15-CV-03229 YGR
010525-11  888342 V1

the same thing. There's a couple that sat behind me at one of the games where she wasn't paying attention. The ball was coming directly towards her. Her husband stood in front of her and caught that ball, just missing her head. And she was only a seat behind me. And I'm thinking, '[w]ell, if I wouldn't have ducked, that ball could have been headed towards me.'" *Id.* at 50:9-19. Ms. Payne testified that "five to six foul balls" that come into Section 211 *per inning*. *Id.* 46:21-25. In sum, she feels like she is in "imminent danger" of being struck by balls in her two sections. *Id.* at 53:17-21.

During her deposition, defense counsel asked Ms. Payne if Section 215 is protected by backstop netting, and she said no. *Id.* at 27:21-23. Defense counsel showed her a picture ostensibly taken from Section 215, where the backstop netting is visible, and repeatedly asked her if it refreshed her recollection whether it was "possible that there's backstop netting that protects Section 215."[4] Ms. Payne, in subsequent questioning, explained that the netting does not protect her. *Id.* at 49:8-12. Ms. Payne's account is corroborated by an investigator working for Hagens Berman.[5] That investigator, Matt Isaacs, attended a game at Oakland A's Coliseum, and sat in Section 215. According to him, a foul ball "flew sharply into Section 215. The ball came at a slicing arc and landed with force among a crowd of fans sitting in the middle of the fourth row." *Id.* ¶ 2. He also stated that the netting "in practice, protects only the first level seats." *Id.* ¶ 4.

Ms. Payne agreed to be a plaintiff in this case because "I'm hoping that they -- Major League Baseball will think of the fans and add netting to protect the fans. I have family members that attend games. And I would hate to see one of them get hit by a ball. And not just me. Just the fans that sit in my section that are afraid of the balls coming into the section, as well as I am." *Id.* at 42:18-25.

**2.     Stephanie Smith**

Plaintiff Stephanie Smith testified that she grew up playing several different sports, including fast-pitched softball.[6] She has attended over 100 games at Dodgers stadium, and about 200 games total in her lifetime, including in San Francisco, Oakland, Anaheim, and Seattle. *Id.* at 20:9-22; 25:17-26:2; 36:25-37:5. She first started attending games when she was very young, and she

---

[4] *See id.* at 35:22-23; *see also* Patterson Decl., Ex. E (Payne Dep. Ex. 11).

[5] *See id.*, Ex. F (Declaration of Matt Isaacs).

[6] *Id.*, Ex. G (deposition of Stephanie Smith) ("Smith Dep.") at 36:11-21, 38:9-14.

PLAINTIFFS' SUPP. BRIEFING ON STANDING - 2
Case No.: 4:15-CV-03229 YGR
010525-11  888342 V1

1   remembers her grandfather teaching her about baseball. *Id.* at 37:6-21. She attended the "vast
2   majority" of the games with her family, and going to the games was an opportunity for "family
3   bonding." *Id.* at 37:10-37:21. She loves baseball, and loves "being at the stadium and seeing a game
4   live. There's nothing like it." *Id.* at 37:22-38:2. She misses attending games now, because it is an
5   activity that she has lost with her family. *Id.* at 38:3-8.

6       On June 7, 2015, she was attending a game at Dodgers Stadium with her family when she
7   was struck by a ball as she sat in her seat, near the third baseline, in Section 35. *Id.* at 24:4-25:7,
8   39:5-7, 40:4-13. There was no netting in front of her, and it was not an option for her to change seats
9   to seating behind the netting. *Id.* at 24:10-25:4. Right before she was struck, she watched the ball
10  leave the bat, and tried to move out of the way—but the line-drive shot curved into her seating area.
11  *Id.* at 40:21-41:12. The EMS soon arrived on the scene and took her away on a stretcher. *Id.* at
12  42:15-21. Physicians at the stadium initially were concerned that she had a life-threatening injury,
13  and told her to go to the emergency room. *Id.* at 46:6-17. Doctors in Los Angeles diagnosed her with
14  ▮▮▮▮▮▮. *Id.* at 49:2-7. In Seattle, her primary care doctor diagnosed her with ▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 50:1-50:22. ▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮. *Id.* at 53:17-21. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 54:3-8. ▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 53:4-16.

21      After she was struck, she attended another game in Seattle, but behind the netting. *Id.* at
22  26:23-25. She attended a second game, also in Seattle, and sat in upper left field, with "two of my
23  coworkers who were big and strong who could protect me." *Id.* at 27:1-15.

24      She has not attended any games since that time. *Id.* at 25:14-26:2. She has had multiple
25  offers, including from her father in March 2016, but she texted her father that she probably was not
26  coming because she was "still freaked out about getting hit."[7] She also texted her friend in

27
---
28      [7] *Id.* at 30:5-8; Patterson Decl., Ex. H (Smith Dep. Ex. 3).

PLAINTIFFS' SUPP. BRIEFING ON STANDING - 3
Case No.: 4:15-CV-03229 YGR
010525-11 888342 V1

September 2015 that she "would love to" attend a game with field-level seating, "but only if there is a net . . . my ribs have just recently healed from the line drive incident. And I have a little ptsd."[8] The existence of netting in front of her seats continues to be a "requirement" for her to attend a game. *Id.* at 35:10-21. However, tickets behind the netting are "extremely expensive"—at least $500 a ticket. *Id.* at 55:1-55:7.

If nets were expanded, Ms. Smith would at least consider attending a game because she could sit where she could see the game, but still be protected. *Id.* 56:3-24. As of now, however, she is "not comfortable" and "too afraid" to attend. *Id.* at 57:24-58:1.

**B.     Defendants' Own Data is Incomplete**

In contrast to the clear testimony from the Plaintiffs, the data from Defendants is murky. Major League Baseball, and the two clubs for which the Court ordered discovery, do not keep records of foul balls that enter the stands, nor do they have any quantitative analysis on the probability that fans will be struck by baseballs.[9] They have produced other data, including injury reports, but these injury reports are under-inclusive in that they do not capture all the foul balls. The Oakland Athletics have also produced "Foul Ball Club" cards, which fans may fill out if they catch a ball to enter into a contest. But filling out these cards is entirely optional, and the Athletics' company representative testified that he did not know how often fans actually filled out the cards, and how often fans who caught balls actually received the cards.[10]

### III.     ARGUMENT

Parties have standing if they can establish (1) injury in fact; (2) causation between the injury and the challenged conduct; and (3) redressability.[11] "The term 'Injury in fact' . . . serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a

---

[8] Patterson Decl., Ex. I (Smith Dep. Ex. 4).

[9] *Id.*, Ex. J (MLB's Resp. and Obj. to First Set of Interrogatories to Certain Defendants), Resp. Nos. 1 & 2; *id.*, Ex. K (Los Angeles Dodgers' Resp. and Obj. to First Set of Interrogatories to Certain Defendants), Resp. Nos. 1 & 2; *id.*, Ex. L (Oakland Athletics' Resp. and Obj. to First Set of Interrogatories to Certain Defendants), Resp. Nos. 1 & 2.

[10] *Id.*, Ex. M (deposition of David Rinetti) at 17:6-20:5.

[11] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). If Plaintiffs establish injury, then the remaining two elements are necessarily met. The lack of safety netting causes the injury, and expansion of the netting redresses that injury.

PLAINTIFFS' SUPP. BRIEFING ON STANDING - 4
Case No.: 4:15-CV-03229 YGR
010525-11 888342 V1

person with a mere interest in the problem."[12] The interest sufficient to confer standing "at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values."[13] Plaintiffs here have established standing based on their risk and fear of being struck by baseballs, and on the deprivation of their ability to enjoy the game based on the lack of safety netting.

"An injury-in-fact may simply be the fear or anxiety of future harm."[14] A fear is reasonable if the expectation of a harm occurring is "actual and well-founded."[15] The Ninth Circuit explained how fear and anxiety confer standing in *Krottner v. Starbucks Corp.*[16] In that case, a Starbucks corporate laptop was stolen, containing unencrypted personal information on about 97,000 Starbucks employees. Former employees sued for negligence. Plaintiffs did not claim that their personal information was in fact misused, but one plaintiff claimed that he had experienced "generalized anxiety and stress" about the *possibility* of his information being misused. The Ninth Circuit concluded that this anxiety and stress sufficed to establish standing.[17] For the remaining plaintiffs, the Ninth Circuit found standing based on the *risk* of future harm from misuse of their personal information as a result of Starbuck's alleged negligence. As it explained, "[b]ecause the plaintiffs had alleged an act that increased their *risk* of future harm, they had alleged an in injury-in-fact sufficient to confer standing."[18]

---

[12] *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) ("We have allowed important interests to be vindicated by plaintiffs with no more at stake . . . than a fraction of a vote; a $5 fine and costs; and a $1.50 poll tax.") (citations omitted).

[13] *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) (APA case) (citations omitted).

[14] *Denny v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *see Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 525 (S.D. Cal. 2011) (same); *see also Doe v. Chao*, 540 U.S. 614, 617-18 (2004) (suggesting that plaintiff who was "torn . . . all to pieces" and "greatly concerned and worried" when his SSN was disclosed had Article III standing to sue); *Davis v. Astrue*, 874 F. Supp. 2d 856 (N.D. Cal. 2012) (noting with approval that "many courts have found that emotion distress may constitute an injury-in-fact for purposes of standing"); *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 643 F. Supp. 2d 446 (S.D.N.Y. 2009) ("An injury-in-fact may simply be the fear or anxiety of future harm.").

[15] *See Libertarian Party of Los Angeles Cty. v. Bowen*, 709 F.3d 867, 870 n.3 (9th Cir. 2013).

[16] 628 F.3d 1139 (9th Cir. 2010); *see Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629 (7th Cir. 2007).

[17] *Krottner*, 628 F.3d at 1142.

[18] *Id.* at 1143 (emphasis added).

1    In this case, there is no viable method of calculating the risk of being struck by a baseball or bat in the two stadiums at issue. But even the limited evidence suggests that the risk is substantial. During the 2015 season at Dodgers Stadium, when Ms. Smith was hit, ███████████ ███████████████████████████████.[19] With 83 home games that year,[20] ████████ ████████████████████████████████████████. On June 7, 2015, when Ms. Smith was hit, ██████████████████████████████████████████████████████████████ ██.[21] Overall, the list of injuries that year is sobering. They include: ███████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████.[22]

In addition, the fear of being struck is imminently reasonable. Ms. Payne testified that she is concerned about balls hitting her, and that this interferes with her ability to enjoy the game. She testified that several balls enter her section every inning, and she spends the game "dodging and weaving." She is a big fan of baseball; she has attended several games this year, and intends to continue to attend games in the future. But she does so with the unease that she might be struck by a ball. She is also concerned that members of her family, or anyone else, would be struck by a ball. Her fear and anxiety are real, and are more than sufficient to establish standing here.

The deprivation of their ability to enjoy the game confers an independent basis for standing, as demonstrated in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*[23] In that case, Laidlaw received a permit to discharge treated wastewater into the North Tyger River in South Carolina, but the permit limited the amount of pollutants that could be discharged. Plaintiffs claimed injury because they were concerned about the mercury levels, which affected their ability to enjoy the river, although the district court found that the discharge did not in fact harm the environment.

---

[19] *See* Patterson Decl., Ex. N.
[20] *See* http://www.truebluela.com/2014/9/8/6114295/dodgers-2015-schedule.
[21] *See* Ex. N at rows 12, 23, 54.
[22] *See id.* at rows 6, 35, 40, 84, 133, 149.
[23] 528 U.S. 167 (2000).

On appeal defendant claimed plaintiffs lacked standing to challenge defendant's conduct. The Supreme Court disagreed, and held plaintiffs' alleged "concerns" about the pollutants (notwithstanding the lack of demonstrable environmental harm[24]) and their inability to enjoy the river met the standing requirements. For example, one plaintiff stated in a declaration that she stopped walking and bird-watching near the river because she was "concerned about harmful effects from discharged pollutants."[25] Other plaintiffs made similar sworn statements. The Court concluded that "these sworn statements . . . adequately documented injury in fact."[26] As the Court held, "Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests."[27] It rejected the dissent's argument that the case was similar to *Lyons*, where the Court rejected standing for citizens to challenge the use of chokeholds by police because their concern about being choked again was too speculative.[28] It held that the plaintiffs' fear was "reasonable," in part because the plaintiffs had used the local river in the past, and expressed a desire to do so again.[29]

Plaintiff Stephanie Smith has easily met the *Laidlaw* threshold. Ms. Smith has already been struck by a baseball, and suffered significant injuries as a result. She testified how attending games was an important "family bonding" time for her, but that now she cannot attend games without safety netting. She also described how she loved baseball, and loved attending the games. The impact on her life is far greater than the loss of enjoyment from walking alongside a river, particularly when the *Laidlaw* plaintiffs presumably could have found another river for their daily strolls. For Ms. Smith, however, there is no substitute for attending baseball games.

## IV.   CONCLUSION

Plaintiffs respectfully submit that the evidence conclusively demonstrates that they have suffered an injury in fact, and accordingly have standing to bring this lawsuit against the defendants.

---

[24] *Id.* at 198 (Scalia, J., dissenting).

[25] *Id.* at 182.

[26] *Id.* at 183.

[27] *Id.* at 183-84.

[28] *Id.* at 185 (distinguishing *Los Angeles v. Lyons*, 461 U.S. 95 (1983)).

[29] *Id.* at 198.

| | | |
|---|---|---|
| 1 | DATED:  July 26, 2016 | HAGENS BERMAN SOBOL SHAPIRO LLP |
| 2 | | By   */s/ Jerrod C. Patterson* |
| 3 | |     JERROD C. PATTERSON (*Pro Hac Vice*) |

Steve W. Berman (*Pro Hac Vice*)
Anthea Grivas (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
jerrodp@hbsslaw.com
steve@hbsslaw.com
antheag@hbsslaw.com

Robert Hilliard (*Pro Hac Vice*)
Marion M. Reilly (*Pro Hac Vice*)
HILLIARD MUÑOZ GONZALES L.L.P.
719 S. Shoreline Blvd., Suite #500
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
bobh@hmglawfirm.com
marion@hmglawfirm.com

Jeff D. Friedman (173886)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

*Counsel for Plaintiffs Gail Payne and Stephanie Smith*