KEKER & VAN NEST LLP
JOHN W. KEKER - #49092
jkeker@kvn.com
R. ADAM LAURIDSEN - #243780
alauridsen@kvn.com
THOMAS E. GORMAN - #279409
tgorman@kvn.com
PHILIP J. TASSIN - #287787
ptassin@kvn.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:     (415) 391-5400
Facsimile:     (415) 397-7188

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAIL PAYNE, ROBERT GORMAN, and STEPHANIE SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL (d/b/a MAJOR LEAGUE BASEBALL); ROBERT D. MANFRED, JR., THE LOS ANGELES DODGERS, THE SAN DIEGO PADRES, THE SAN FRANCISCO GIANTS, THE LOS ANGELES ANGELS OF ANAHEIM, THE OAKLAND ATHLETICS,<br><br>Defendants. | Case No. 4:15-cv-03229-YGR (DMR)<br><br>**DEFENDANTS' SUPPLEMENTAL REPLY BRIEF ON STANDING**<br><br>Judge:     Hon. Yvonne Gonzalez Rogers<br><br>Complaint Filed:          July 13, 2015<br>First Am. Complaint Filed:   Oct. 23, 2015<br><br>Trial Date: None Set |

## I.     INTRODUCTION

Plaintiffs have failed to establish standing again.  In April, the Court requested discovery on the "risk of injury to the specific named plaintiffs."  Dkt. 69 at 11:10.  In particular, the Court asked the parties to calculate "the probability that a given individual, seated in plaintiffs' specific sections . . . will be hit by a stray ball or bat."  *Id.* at 11:16–18.  During discovery, Defendants produced over 6,000 pages of ballpark-attendance data, insurance claims, medical reports, security logs, foul-ball cards, errant/broken bat logs, foul-ball statistics, and injury reports.  Declaration of Thomas E. Gorman ("Gorman Decl.") at ¶ 2.  Plaintiffs ignore all of this evidence because they do not want to admit that the risk to Ms. Payne is nearly zero, and the risk to Ms. Smith actually ***is*** zero.  Instead, Plaintiffs now tacitly concede that they cannot show a "certainly impending injury," and instead argue that vague allegations of "fear" and diminished enjoyment are enough to establish standing.  Plaintiffs' new arguments fail as a matter of law.

## II.    LEGAL STANDARD

Plaintiffs have failed to establish any of the elements of Article III standing—(1) injury-in-fact, (2) traceability, or (3) redressability—but the focus is on injury-in-fact.  Plaintiffs cannot show an "invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Pointing to an "objectively reasonable likelihood" of future harm is ***not*** enough.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147–48 (2013).  Rather, Plaintiffs must show a "certainly impending" injury.  *Id.*  Allegations of "fear" or "subjective apprehensions" do ***not*** establish standing.  *Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).  Instead, this Court must focus on "the likelihood" that "the allegedly unlawful conduct" will occur.  *Id.*

## III.   FACTS DEVELOPED IN DISCOVERY

### A.     Gail Payne.

Plaintiff Payne has attended "well over 100 games during her lifetime"—in various sections of the Oakland Coliseum—and she has never been struck by a foul ball or errant bat.  Gorman Ex. 1 ("Payne Dep.") at 19:19–21, 41:15–20, 20:24–23:20.  For the 2015 season, Payne purchased a 24-game package and explicitly chose Section 211—a plaza-level section that is not

behind netting.  She chose Section 211 because she previously "had a good experience attending a game in Section 208"—which also lacks a net—and wanted to sit "as close as possible."  *Id.* at 24:21–25:1, 26:14–27:8.  Ms. Payne knew that she could request seats behind the net, but she chose not to do so.  *Id.* at 38:21–24.  The Athletics granted Ms. Payne's request for Section 211 for the majority of her 24-game package, but, for a handful of games, she sat in Section 215.  *Id.* at 27:9–20; Gorman Exs. 2–3.  Section 215 is also on the plaza level, but it is directly behind home plate.  Gorman Ex. 4.  The Coliseum's net stands directly between home plate and Section 215.[1]  For the 2016 season—which began roughly nine months *after* Ms. Payne filed suit—Ms. Payne told the Athletics that she would "prefer to just keep the same seats."  Payne Dep. at 32:6–25.  Amazingly, Ms. Payne testified that approximately 45 to 54 foul balls per game enter Section 211.  *Id.* at 46:21–47:4.  But MLB produced its pitch-result statistics for Oakland home games.  The average number of foul balls per game—including balls blocked by the net, balls that stay on the field, and balls that enter *any* seating section—was 47.7.  Gorman Decl. at ¶ 7.  Even in an impossible world where the net blocks no foul balls and no foul balls stay on the field, Ms. Payne would need *all* foul balls to enter her section for her estimate to be mathematically possible.

In both seasons, Ms. Payne took advantage of the Athletics' "Flexible Exchange Policy" to trade for tickets in other sections.  Gorman Ex. 6 at 9, 12.  Ms. Payne *never* asked to move behind the net, or out of range of foul balls.  Payne Dep. at 40:1–3.  Plaintiffs have focused their allegations on Sections 211 and 215, but have not offered any data on the risk in those sections.

| *See* Gorman Decl. at ¶ 9 for methodology. | **2014** | | **2015** | | **2016** (partial season) | |
|---|---|---|---|---|---|---|
| | Injuries | Tickets issued | Injuries | Tickets issued | Injuries | Tickets issued |
| **Section 211** | 0 | 8,146 | 0 | 6,194 | 0 | 764 |
| **Section 215** | 1 | 11,155 | 0 | 9,471 | 0 | 1,036 |

Over a time period that includes 36,766 issued tickets, only one injury was reported (in the section that Ms. Payne uses rarely).  The injury rate in those sections is approximately 0.0027% for each ticket.  For perspective, the probability of *not* being injured is **99.997%**, so the

---

[1] Dkt. 87-6 (Decl. of Matt Isaacs) Exs. 1–2.  A foul ball could land in Section 215 if it flew up and over the backstop net (what Plaintiffs' "investigator" calls a "slicing arc").  But if you draw a straight line between home plate and Section 215, which is the path of a line-drive, the line is blocked by the net.  *See* Dkt. 87-6 Exs. 1–2 (showing home plate visible *through* the net).

probability of not being injured two games in a row is 99.997% squared (99.995%), for three games it is 99.997% cubed (99.993%), and so on.  Thus, the probability of remaining uninjured stays above 50% until she attends 25,483 games.  Ms. Payne has a package of 24 games per year, but even if she attends *every* Athletics home game, attending 25,483 games will take 314 years.[2]

### B.    Stephanie Smith.

Plaintiff Smith has attended almost 200 Major League games, including over 100 games at Dodger Stadium; she has been struck by a ball once.  Gorman Ex. 11 (Deposition of Stephanie Smith ("Smith Dep.")) at 20:9–12, 21:15–18, 36:25–37:5.  In 2015, Ms. Smith purchased tickets to attend a June 7 game in Field Box 35.  *Id.* at 23:4–7, 24:4–7.  When she arrived at the park, Ms. Smith realized that her seats were ***not*** behind a net, but she did not ask to move to another section.  *Id.* at 24:15–25:4.  Plaintiffs claim that exchanging seats was "not an option,"[3] but—in reality—the Dodgers would have accommodated her if she had simply asked.  Declaration of Bill Hunter at ¶ 2.  On that day, for example, the Dodgers had over 4,850 available seats that were either behind the backstop net, or out of range for both foul balls and bats.  *Id.* at ¶ 3.  Ms. Smith did not ask to move, and during the game a foul ball struck her in the abdomen.

Since that incident, Ms. Smith has attended ***zero*** games at the Defendants' ballparks.  Smith Dep. at 25:14–16.  Ms. Smith testified that she actually has ***no*** plans to attend ***any*** Major League games.  *Id*. at 34:15–25.  Thus she faces ***zero*** risk of injury.  Instead of addressing this fact, Plaintiffs misleadingly suggest that other patrons, sitting in other sections, face risk.  But the Court instructed the parties to focus on the "risk of injury to the specific named plaintiffs."  Dkt. 69 at 11:7–18.  The risk to Ms. Smith is zero because she has no plans to attend games.

To the extent that the Court is interested, sitting in Field Box 35 poses an extremely low risk of injury.  Over the last 5.25 seasons, ***not a single*** bat or bat fragment has entered Field Box 35, or even travelled anywhere near Field Box 35.  Gorman Decl. at ¶ 10.  For foul balls, the

---

[2] Plaintiffs don't discuss bats in their brief, probably because—over the last 5.25 seasons—***not a single*** bat or bat fragment has entered either of Ms. Payne's sections.  Gorman Decl. at ¶ 10.  In fact, they haven't come even remotely close to Payne's seats.  *Id.*

[3] Pltfs. Supp. Br. at 3:8–9.  Plaintiffs did not take any discovery on the Dodgers' policy for exchanging tickets.  Plaintiffs base their inaccurate description of the Dodgers' policy on Ms. Smith's assessment that she "do[es]n't think that's how the world works."  Smith Dep. at 25:2–4.

1  Dodgers record an "incident" in their logs whenever a security officer is dispatched, and thus
2  their logs record much more than injuries.  For example, a security officer is dispatched to *all* foul
3  balls that enter the stands (unless a fan cleanly catches the ball in his or her mitt).  Even so, the
4  number of "incidents" in Field Box 35 is extremely low.  In the 2+ seasons where attendance data
5  is available, covering 27,181 attendees, the incident rate in Field Box 35 is approximately 0.018%
6  for each fan-visit.  Since the probability of *not* being involved in another incident is 99.98% per
7  game, the probability of remaining
8  uninvolved falls below 50% only after
9  3,813 future games (which would
10 require Smith to attend every Dodgers
11 home game in Field Box 35 for over 47
12 years).

|  | **2014** | **2015** | **2016** (partial season) |
|---|---|---|---|
| **Incidents** | 2 | 3 | 0 |
| **Attendance** | 12,555 | 12,804 | 2,154 |
| *See* Gorman Decl. at ¶ 12 for methodology. | | | |

### IV.   ARGUMENT ON INJURY IN FACT

As Chief Judge Hamilton held in a case brought by the same plaintiffs' counsel, plaintiffs cannot show a "certainly impending" injury merely by offering "speculative and nebulous" allegations of "risk."  *Mehr v. Féderation Internationale de Football Ass'n*, 115 F. Supp. 3d 1035, 1057–58 (N.D. Cal. 2015).  Instead, the court suggested, plaintiffs must allege "facts showing" that plaintiff "is in imminent danger of injury."  *Id.* at 1057.  Here, the facts definitively prove that Plaintiffs cannot show imminent danger.  Ms. Payne sits in sections where the evidence shows only 1 injury against 36,766 patrons.  Her risk is extremely remote.  Ms. Smith's situation is best analogized to *Mayall v. USA Water Polo, Inc.*, where a plaintiff, also represented by the same counsel, alleged a previous "medical injury" from playing water polo.  — F. Supp. 3d —, 2016 WL 1254034, at *2 (C.D. Cal. Mar. 30, 2016).  The court held that—because the plaintiff had apparently stopped playing the sport—she could not establish standing for injunctive relief.  *Id.*  The plaintiff was not "realistically threatened by a repetition of the violation" because she no longer played and therefore no longer faced any risk.  *Id.*  Here, Ms. Smith has testified that she will not attend any Major League games, and thus too she faces zero risk.[4]

---

[4]  Plaintiff Smith *does* have standing to bring a state-law claim against the Dodgers for *past* damages even though she lacks standing to seek injunctive relief.  The proper venue for a

Plaintiffs make a final attempt to show a certainly impending injury by inappropriately focusing on seating sections that Plaintiffs will not sit in, and they mischaracterize the evidence to boot. For example, Plaintiffs claim that in 2015, in *all* areas of Dodger Stadium, "153 fans were struck hard enough to warrant the offer of medical treatment." Pltfs. Supp. Br. at 6:3–10. That is false, but even if it were true, the Dodgers had over 3.7 million spectators in 2015, so 153 incidents would equate to a stadium-wide incident rate of only 0.004% per fan-visit. Gorman Decl. at ¶ 13. But that figure is dramatically inflated, because Plaintiffs mistakenly assume that each event in a security log is an injury. In reality, many are not.[5] Moreover, 38% of Plaintiffs events are irrelevant to their allegations, including 31 incidents involving home-run balls but not foul balls, 25 incidents in sections that are behind the backstop netting, and 2 where a player tossed a souvenir ball to fans. Gorman Decl. at ¶ 16(i)–(iii). Plaintiffs also include 25 incidents where the fan refused all assistance. *Id.* at ¶ 16(iv). Plaintiffs even mischaracterize their cherry-picked incidents. For example, Plaintiffs claim that an "infant" was "struck by a ball," but the underlying report quotes the boy's mother as stating that her son was merely "scared of neighbouring [sic] commotion." Gorman Ex. 18. Plaintiffs cannot establish standing by mischaracterizing the evidence in different sections.

Plaintiffs tacitly concede that there is no certainly impending injury by focusing instead on two new theories. They claim that Ms. Payne's "fear and anxiety" are "sufficient to establish standing," and that Ms. Smith has suffered "deprivation" of her "ability to enjoy the game." Pltfs. Supp. Br. at 6:17–18. Neither of these new theories is supported by the facts or the law.

***First***, the Supreme Court has repeatedly held that "fear" or "emotional upset" alone is not enough to establish standing. *Lyons*, 461 U.S. at 107 n.8. Instead, the Court must assess the "reasonableness" of the "fear" by examining "the likelihood of . . . the allegedly unlawful conduct." *Id.*; *see also Clapper*, 133 S. Ct. at 1152 (holding that "fear is insufficient to create

---

damages case is in Los Angeles, and Smith likely cannot establish diversity jurisdiction. If the Court is interested, Defendants can provide briefing on this issue.

[5] Gorman Ex. 16 (Dodgers Resp. to Rog No. 4) (explaining that incidents are logged any time a ball or bat enters the stands, unless it "landed in an area where there are no fans (for example, an empty walkway), or if a fan caught the ball cleanly in the air.") Gorman Ex. 17 (Deposition of Michelle Darringer) at 15:13–17, 17:5–18:7 (same).

standing" if plaintiffs "do not face a threat" that is "certainly impending"). Plaintiffs try to distance themselves from these Supreme Court holdings by citing lower-court decisions, but the cited passages are dictum because those cases didn't even involve allegations of fear or anxiety.[6] Ms. Payne also compares herself to plaintiffs whose private, personal information—which could be used to commit identity theft—was stolen from an employer. Pltfs. Supp. Br. at 5:5–16 (citing *Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010)). But the *Krottner* plaintiffs feared impending identity-theft because one of the stolen Social Security numbers had already been used in an attempted fraud and could be used again. 628 F.3d at 1141. By contrast, these Plaintiffs allege fears that are ***not*** based on an impending threat. Smith, like the retired water-polo player in *Mayall*, faces no threat because she isn't going to any games. Payne is under no real threat because the evidence shows how unlikely it is that she will be harmed. More importantly, the *Krottner* plaintiffs alleged that their legally protected right (a right to data privacy) was invaded involuntarily. Here, Plaintiffs' alleged fear arises from attending baseball games in the future—***voluntarily***—in sections that do not have a net. Using Plaintiffs' data-breach analogy, Ms. Payne is akin to someone who alleges that she is wracked with anxiety every time she publishes her personal information on the public internet, but who continues to do so voluntarily.

***Second***, Plaintiffs claim that "deprivation of their ability to enjoy the game confers an independent basis for standing." Pltfs. Supp. Br. at 6:18. Here, Plaintiffs focus on Ms. Smith's unilateral decision to stop attending baseball games. But, Ms. Smith has the option to sit in seats behind netting.[7] She could also sit in the bleachers, or the upper deck, or in any number of sections that are not within range of foul balls. Except Ms. Smith believes that these seats were "not worth it" and "not fun." Smith Dep. at 57:2–7, 66:8–15. But whatever Ms. Smith's preferences are, she has no legal right to demand tickets where she "prefer[s] to sit." *Id*. at 56:9–

---

[6] The injury alleged in *Denney v. Deutsch Bank AG* was "excessive fees" and "costs." 443 F.3d 253, 265 (2d Cir. 2006). In *Campion v. Old Republic Home Protection Co.*, plaintiffs exclusively focused on economic injuries. 272 F.R.D 517, 526 (S.D. Cal. 2011). *In re Methyl Tertiary Butyl Ether Litig.* found standing based on "a wrongful invasion of personal or property rights" and diminished property values. 643 F. Supp. 2d 446, 454–55 (S.D.N.Y. 2009). *Davis v. Astrue* actually did involve allegations of anxiety, but the Court held that "Plaintiffs' primary injury in fact is the alleged discrimination suffered." 874 F. Supp. 2d 856, 863 (N.D. Cal. 2012).

[7] Ms. Smith believes that seats "behind the net" cost "$500-plus." Smith Dep. at 55:4–7. In reality, most seats behind the net cost less than Field Box 35. Gorman Decl. at ¶ 18.

15. If she feels that sitting behind a "net" is now "a requirement," then she can purchase seats behind the net or she can refrain from attending games. *Id*. at 35:18–21. In either case, though, she cannot show a certainly impending injury. Plaintiffs turn to *Laidlaw*, but those plaintiffs relied on a citizen-suit law that granted legal rights to all "persons having an interest which is or may be adversely affected" by water pollution. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 173 (2000) (quoting 33 U.S.C. §§ 1365(a), (g)). Justice Ginsberg's majority opinion explains that the *Laidlaw* plaintiffs had demonstrated that the challenged violation—illegal dumping of toxic chemicals—was ***actually*** occurring. 528 U.S. at 184. So the *Laidlaw* plaintiffs were suffering an invasion of a legally protected interest. This distinguished *Laidlaw* from cases like *Lyons*, where "reasonableness" of the "fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct." *Id.* (quoting *Lyons*, 461 U.S. at 108 n.8). In *Laidlaw*, the unlawful dumping was undisputed, and thus the plaintiffs' response was reasonable. Here, even if Smith did return to Field Box 35, the probability of a recurrence is 0.018%. And having decided not to attend any games, she now faces no threat.

## V.   ARGUMENT ON TRACEABILITY AND REDRESSABILITY

Plaintiffs also fail to address their traceability and redressability problems. Plaintiffs cannot claim a traceable injury against the Padres, Angels, or Giants because both Plaintiffs testified that they have no plans to attend any of their games.[8] And Plaintiffs still haven't explained how netting *in the future* will redress their meritless allegation of fraudulent concealment *in the past*. *See* Dkt. 52 (MTD) at 13:14; Dkt. 57 (Reply) at 5–6.

## VI.   CONCLUSION

After extensive discovery, Plaintiffs are no closer to establishing Article III standing. If vague allegations of "fear" and diminished enjoyment were enough, then Federal courts would be empowered to intervene in every societal decision that balances risk against freedom, including decisions on driving, flying, construction, sports, and all manner of outdoor activities. Those are decisions for politicians and regulators, not courts. This case should be dismissed.

---

[8] Payne Dep. at 37:10–19, 45:16–46:4; Smith Dep. at 34:15–35:17. *See Easter v. Am. West Fin.*, 381 F.3d 948, 961–62 (9th Cir. 2004) (holding that at least one named plaintiff must be able to trace their alleged injury-in-fact to each named defendant); *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1069 (N.D. Cal. 2015).

Dated: August 9, 2016                           KEKER & VAN NEST LLP

                                         By: */s/ John W. Keker*
                                             JOHN W. KEKER
                                             R. ADAM LAURIDSEN
                                             THOMAS E. GORMAN
                                             PHILIP J. TASSIN

                                             Attorneys for Defendants